RUSH MOORE LLP
A Limited Liability Law Partnership

FIRST CIRCUIT COURT
STATE OF HAWAII
FILED

2017 JUL 21  PM 4: 02

N. ANAYA
CLERK

JASON M. TANI          4859-0
STUART T. FEELEY       4218-0
BRYAN M. HARADA        8563-0
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2400
Honolulu, Hawaii  96813
Telephone No.: (808) 521-0400
Facsimile No.: (808) 521-0497

Attorneys for Plaintiff
KELLY M. TOLAR

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| KELLY M. TOLAR,<br><br>Plaintiff,<br><br>vs.<br><br>EYE PRODUCTIONS, INC.; CBS FILM DISTRIBUTIONS, INC.; CBUBTL (Hawaii 5-0) dba ENTERTAINMENT PARTNERS; CBS CORPORATION, INC.; JEFFREY M. DOWNER; JAKE DOWNER; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE "NON PROFIT" CORPORATIONS 1-10; and DOE GOVERNMENTAL UNITS 1-10,<br><br>Defendants. | CIVIL NO. 17-1-1206-07  KKH<br>(Harassment in Workplace)<br><br>COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS TO ANSWER CIVIL COMPLAINT |

I do hereby certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, Circuit Court, First Circuit

**EXHIBIT A**

COMPLAINT

1.      Comes now, Plaintiff KELLY M. TOLAR (referred to herein as
"Plaintiff" or "Tolar"), by and through her attorneys, RUSH MOORE LLP, A LIMITED
LIABILITY LAW PARTNERSHIP, and for a cause of action against the Defendants above-
named alleges and avers as follows:

2.      At all relevant times herein, Tolar is and was a resident of Hawaii and the
City and County of Honolulu.

3.      Tolar was first employed by Eye Productions as a location assistant in July
2012. She was later promoted to key location assistant and office manager.

4.      At times relevant herein, Defendant EYE PRODUCTIONS, INC.
(hereinafter also referred to as "Defendant" or "employer" or "Eye Productions") is and was a
foreign profit corporation incorporated in the state of Delaware.

5.      Defendant EYE PRODUCTIONS, INC. is registered to do business in the
City and County of Honolulu.

6.      At times relevant herein, Defendant CBS FILMS DISTRIBUTION, INC.
(hereinafter also referred to as "CBS," "Defendant" or "employer") is and was a foreign profit
corporation incorporated in the state of Delaware. CBS is registered to do business in the City
and County of Honolulu.

7.      CBUBTL (Hawaii 5-0) dba Entertainment Partners, is the entity listed on
Tolar's paychecks and identified on other stationery and letterhead used at her office.

8.      CBS Corporation, Inc. issued and distributed the CBS Policy Guide
entitled *"CBS & You"* that informed employees it contained "Guidelines for You."

9.      At all times relevant herein, Defendant JEFFREY M. DOWNER (hereinafter referred to as "Jeff Downer" or "Jeff") was an executive producer of Hawaii Five-0 and an employee of Defendant Eye Productions or CBS.

10.     Upon information and belief Jeff Downer is a California resident.

11.     At all times relevant herein, Defendant JAKE P. DOWNER (hereinafter referred to as "Jake Downer" or "Jake") was a locations scout, a locations assistant, and/or employee of Defendant Eye Productions or CBS.

12.     Upon information and belief, Jake Downer is currently a California resident, but was a Hawaii resident during relevant times herein.

13.     Tolar, Jake Downer, and Jeff Downer all worked at Hawaii 5-0, aka Hawaii Five-0, a television series, as their principal project.  Hawaii 5-0 was produced, distributed, promoted and/or advertised by the company-defendants named herein.

14.     Tolar has reviewed records at the State of Hawaii, Department of Commerce and Consumer Affairs, in order to ascertain the true and full names and identities of all potential defendants in this action, but has no further knowledge or information regarding the parties responsible and is unable to ascertain the identity of the defendants in this action designated as Defendants JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE "NON-PROFIT" CORPORATIONS 1-10; and DOE GOVERNMENTAL UNITS 1-10 (hereinafter collectively "DOE Defendants").  Said DOE Defendants are sued herein under fictitious names for the reason that their true names and identities are presently unknown to the Plaintiff, except that they are connected in some manner with the named Defendants and are the agents, servants, employees, employers, representatives, co-venturers, associates, vendors, suppliers, manufacturers, subcontractors or subsidiaries of the

named Defendants and/or were in some manner presently unknown to Tolar engaged in the activities alleged herein, and/or were in some manner responsible for the injuries or damages to Tolar and/or conducted some activity in a negligent and dangerous manner, which negligent or dangerous conduct was the proximate cause of injuries and damages to Tolar and/or in some other manner are related to the named Defendants and that their true names, identities, capacities, activities and/or responsibilities are presently unknown to Tolar's attorneys.   Reference hereinafter to a named Defendant is also an allegation against all unidentified DOE Defendants. Tolar prays leave to amend this Complaint to allege or identify the true names and/or capacities of the DOE Defendants set forth in this paragraph when the same are ascertained.

15.     All events material herein occurred within the City and County of Honolulu, and the Defendants are domiciled within the City and County of Honolulu, and within the jurisdiction of the Circuit Court of the First Circuit, State of Hawaii.   The amount at issue is within the jurisdictional limits of said Circuit Court of the First Circuit.   The Circuit Court of the First Circuit, State of Hawai'i has jurisdiction over this action pursuant to Hawai'i Revised Statutes ("HRS") § 603-21.5 (2008) and venue in is proper in this Court under HRS § 603-36(5) (2016).

16.     Eye Productions, Inc. is affiliated with CBS.

17.     The defendant-companies share certain assets, resources and information that is not generally available to non-affiliated companies.

18.     Upon information and belief, CBS is a parent company of Eye Productions, Inc.

19.     The defendant-companies share certain company policies and procedures.

20.     Upon information and belief, CBS issues certain guidelines to Eye Productions, Inc. that CBS expects Eye Productions to follow.

21.     During relevant times herein, Defendant Eye Productions, Inc. has employed more than 200 employees in Hawaii.

22.     Eye Productions, Inc. produces a television program known as Hawaii Five-0.

23.     Eye Productions, Inc. is the former employer of Defendant Jake Downer.

24.     During relevant times herein, Eye Productions, Inc. employed Kelly Tolar.

25.     At various times in 2014 and 2015, Jake Downer worked on the "set," on location, at the same time as Tolar was working there.

26.     At various times in 2014 and 2015, Jake Downer also worked in the Diamond Head Studio office where and when Tolar was working.

27.     In his capacity as a manager and/or Executive Director, Jeff Downer directly or indirectly managed mid-level managers of Eye Productions to whom Tolar reported.

28.     At relevant times herein, various mid-level managers, including Kelly Tolar's managers or supervisors reported directly to Defendant Jeff Downer, the co-executive producer at Eye Productions and its top executive in Hawaii.

29.     Jeff Downer and Jake Downer not only worked for the same company (Eye Productions), but Jeffrey is Jake's father, and, thus they have a father-son relationship.

30.     During her active employment, Tolar reported directly to Timmy Chinn ("Chinn"), a director/manager of the Locations Department.  Chinn reported directly to Jeff Downer.  Tolar also reported to a supervisor, Amira Soliman ("Soliman").

31.     Soliman and Chinn were directly responsible for the actions and well-being of Tolar, while Jeff Downer was indirectly responsible for the actions and well-being of

Tolar. Soliman, Chinn, and Jeff Downer were similarly responsible for the actions of Jake Downer.

32.     At relevant times herein, Jeff Downer had ultimate responsibility for the actions of Chinn and Amira Soliman, Jeff Downer as the top management executive to whom they reported.

33.     Chinn and Soliman had authority over Plaintiff Kelly Tolar and Jake Downer at Eye Productions, and were responsible for supervising the duties and responsibilities assigned to Kelly Tolar and Jake Downer.

34.     Chinn and Soliman had authority over the schedule of Kelly Tolar and Jake Downer at Eye Productions.

35.     Jeff Downer and Chinn had authority over certain work assignments given to Kelly Tolar and Jake Downer at Eye Productions.

36.     As the executive director, Jeff Downer had the ultimate authority over employees, supervisors, and managers and had responsibility for conduct of those persons that was brought to his attention.

A.     <u>SPECIFIC ALLEGATIONS AS TO DEFENDANT JAKE DOWNER</u>

37.     Locations assistant/locations scout Jake Downer acted aggressively, unprofessionally, offensively, abusively, and/or in an threatening manner toward Tolar.

38.     Jake Downer's behavior, actions and offensive conduct toward Tolar violated various workplace rules, guidelines, and standards.

39.     Jake Downer's harassment of Tolar, a fellow employee, constituted a pattern and practice of bad behavior in the workplace.

40.     Jake Downer's conduct was embarrassing to Tolar, sometimes occurred in the presence of managers, and was overtly inappropriate.

41.     Initially, Tolar assumed that by attempting to ignore Jake Downer, his bad behavior would stop.

42.     Jake Downer's inappropriate conduct toward Tolar did not stop.  In fact, he continued to pester her and harass her so boldly that he sometimes did it when a manager was observing.

43.     Jake Downer's intimidation, harassment, and inappropriate workplace conduct took place over an extended period of time that began in late September 2014 and continued until December 2015.

44.     Various incidents provide a partial description of a pattern of behavior by Jake Downer toward Tolar and were contemporaneously documented by Tolar to fellow employees, managers, or supervisors.

45.     For example, on March 27, 2015, Tolar prepared a memo to various managers, including Timothy Chinn, Rita Rosenfeld, and Amira Soliman that provided details of Jake Downer's aberrant and frightening behavior.  The memo was sent by email.

46.     Tolar's memo stated that Jake Downer was, "extremely disruptive, and abusive."

47.     Tolar's memo informed her managers that Jake Downer, "tells me [Tolar] every day that I should kill myself."

48.     Additionally, Tolar wrote in her March 27, 2015 email-memo memo that, "this week he blew up yelling at me, telling me that I am a 'stupid fucking idiot,' 'retard' and 'dumb ass.'"  She continued to state that, "he [Jake Downer] disrespects me every day."

49.     In her memo Tolar explained that she has, "complained about his behavior numerous times ..."

50.     She recited how Jake Downer, "just tossed a dead fly on me."

51.     She explained that, "he [Jake Downer] treats me very cruelly, and makes it uncomfortable to be around him."

52.     She continued by stating, "I would appreciate it if someone could speak with him and let him know that none of this is okay. He makes comments, like 'what are you going to do,' 'you're getting fired anyways,' 'I'll just tell my dad,' etc. Its grotesque behavior, and I DO NOT WANT, OR NEED to be treated this way."

53.     Tolar concluded, "I honestly would prefer to talk with Jeff [Downer] myself, but, I'm letting you guys know now, that this has gone too far. I'm done ignoring his abusive behavior."

54.     On August 12, 2015, Tolar sent another memo by text to her manager. She wrote as follows: "Jake is such an asshole. I'm so over him. He just threw a box next to me because I wasn't answering him because I was texting kala. Then I told him he needs to tone it down. Then he told me he doesn't give a fuck."

55.     Tolar's memo continued by stating, "I just can't deal with this shit on a daily basis. I'm here to work. I feel so frustrated. This has been going on for SO LONG."

56.     She further explained, "I just don't think it's fair that I'm the object of his abuse. It sucks. ..... I hate being in the office alone with him. ... I can't deal with this shit everyday."

57.     Later that day, after receiving a response from her manager, Tolar replied, "We gotta keep him out of office.  It's not fair to me to subject me to that everyday.  If this can't be fixed one of us needs to go.  I'm over it. "

58.     After a further acknowledgment by her manager/supervisor, Tolar wrote, "It's just extremely disruptive and distracting and abusive.  It bumbs [bums] me out."

59.     One of her managers replied, "If you write him an email he will react immediately because then it's official and it could be an HR thing.  I just talked to Timmy [Chinn] on the phone a minute ago about it and he said he should mention it to Jeff [Downer]."

60.     One of Tolar's coworkers informed her that Jeff Downer relayed that he "thinks Jake's in love with you [Tolar] hahaha!"

61.     Tolar replied that, "it [it's] so not even funny.  It's fucked up."

62.     Tolar further recounted that, "I guess you weren't here last year [2014] so you don't know what it's like."

63.     On September 1, 2015, Tolar recounted how Jake spit (gleeked) on her by writing, "he gleeked on you then came and gleeked on me.  It's gross."  Her co-worker agreed, by writing, "Oh my fucking God!  That's fucking disgusting."

64.     Her co-worker then wrote, "how can anyone think that that is ok?"

65.     On November 25, 2015, Jake Downer yelled at her and called her an idiot after Jake's father, Jeff Downer (one of the show's producers) discussed the details of a permit with her.  When Tolar's co-worker, Shane Seggar, told Jake Downer to back off, Jake started yelling at him too.

66.     On November 30, 2015, Tolar's supervisor, Amira Soliman, discussed Jake's aberrant behavior with him and told him that he could not speak to Tolar that way.

67.     Nevertheless, Jake was not officially reprimanded or sanctioned for his inappropriate conduct toward Tolar or any other employee of Eye Productions.

68.     On December 1, 2015, Jake pulled Tolar's hair and poked her in the back.

69.     Around the same time, Jake asked if she was playing in the company kickball tournament. When Tolar replied that she was not going to participate, Jake told her he would keep poking her until she said yes.

70.     Also in December 2015, Jake and another co-worker, Kala Crowell, were making a list of items to purchase at Costco. Tolar asked them to work on the list in another room because she was finishing up a permit. Jake became upset and told Kala to, "add gasoline and matches," to the Costco list so he could light Kelly and her desk on fire.

71.     Another time Jake swore at Tolar, and asked her why she was still working [at Hawaii 5-0]. He made comments to Tolar such as the following: "Seriously, when the fuck are you leaving?" and, "Why are you still here."

72.     Although Tolar did not visibly react out of concern that this could lead to further abuse from Jake, Tolar immediately texted a supervisor (Soliman) about the incident.

73.     On December 2, 2015, Tolar was told that Soliman, a supervisor, and Timothy Chinn, a manager, had several discussions about Jake's interaction with Tolar.

74.     Tolar was dissatisfied with the inadequate and indecisive response. Tolar felt vulnerable, unsafe, and anxious about Jake Downer's workplace behavior toward her.

75.     Tolar informed Chinn that she was going to file a police report and call HR about Jake, as she did not feel safe with Jake in the office.

76.     Chinn asked Tolar to hold off on filing such a report until he was able to talk with the producer, Jeff Downer, Jake's father.

77.     Chinn later informed Tolar that he had talked with Jeff Downer and suggested that his son (Jake Downer) work from home temporarily as that was the only way he could get Jeff to cooperate.

78.     In December 2015, Tolar had a meeting with Ian Travers and Amira Soliman and told them that she could no longer handle the stress and abuse any longer.  Tolar broke down and started crying.

79.     On December 16, 2015, Tolar submitted a police report to the Honolulu Police Department about the conduct of Jake Downer.

80.     In that police report, Tolar described Jake Downer's conduct on December 1, 2015 where Downer commented to Tolar's co-worker to add, "Gasoline & Matches to the Costco list; so he could light Kelly & her desk on fire."

81.     In the police report Tolar described how Jake Downer, "pulled my hair after I had asked him not to touch me because he was poking me in the back.  This type of abusive behavior has been happening for over a year.  He used to tell me to kill myself on a daily basis.  I want Jake to stop harassing me, and to leave me alone.  I do not give him permission to touch me or to talk to me like that.  I told my boss on December 3rd, 2015 that I wanted to make a police report.  I did not because he said that he would take care of the problem.  Jake scares me and I do not want to be around him.  He also makes comment about taking photos of me outside my house.  I want him to stay away [and] thus I am making this documentation report so this harassment/threats are documented and on record."

82.     In addition to the documented events, conduct and actions described by Tolar in some of the preceding paragraphs, Jake Downer also did the following to Tolar:

(a)     poured water on her head while standing behind her at the office;

(b)   deliberately stepped on Tolar's bandaged toe while they were in the office at the Diamond Head studio, causing her toe to bleed;

(c)   put thumb tacks on Tolar's chair at the office;

(d)   left dirty dishes on Tolar's chair and told her to wash them;

(e)   stood behind Tolar and flicked food at her, then told her to clean up the floor;

(f)   regularly put rubbish in Tolar's desk and in her jacket pocket;

(g)   stood behind Tolar with scissors or a sharp letter opener to intimidate her;

(h)   punched holes in a Shoji screen separating Tolar's office space from Downer's area;

(i)   threatened to poison the water at the office;

(j)   aggressively grabbed the back of Tolar's neck;

(k)   informed Tolar that he photographed her while hiding outside of her residence;

(l)   regularly photographed Tolar at the office in an obnoxious and intrusive manner that Tolar made clear was *unwanted* and *offensive* to her;

(m)   left threatening, mocking, and juvenile **post-it** notes and drawings on her desk, chair and other places in an effort to humiliate, threaten or intimidate Tolar;

(n)   explosively yelled at Tolar while in close proximity;

(o)   pet Tolar's hair which he referred to as her "rat tail" despite her protests; and

(p)   regularly told Tolar that his dad [Jeff Downer] thinks that she is a "fucking idiot" and then threatened her that he was going to "fire" her.

B.   <u>SPECIFIC ALLEGATIONS AS TO DEFENDANT JEFF DOWNER</u>

83.   As a co-executive producer, Jeff Downer held the top or one of the top executive positions, for the Hawaii Five-0 show in Hawaii.

84.     Jeff Downer had authority over locations manager Timmothy Chinn, locations supervisor Amira Soliman, locations assistant Kelly Tolar, and locations scout, Jake Downer.

85.     Jeff Downer knew or should have known of the repeated complaints by Kelly Tolar, directly and through her supervisors/managers, of the misconduct by Jake Downer.

86.     Jeff Downer did not follow company procedure, guidelines, policy, protocol, or rules which required prompt investigation of alleged wrongdoing by Jake Downer.

87.     Jeff Downer treated the complaints and allegations as insubstantial, exaggerated or a mere nuisance.

88.     Additionally, Jeff Downer commented to Tolar that he was relieved that Tim Farrell (of the Human Resources Department) did not see Tolar's [preserved] "display" of the post-its that Jake had left at Tolar's desk.

89.     Tolar felt her concerns about Jake were not being adequately addressed and that management declined to remedy the long-standing problems beyond the superficial changes and temporary re-location of Jake Downer.

90.     Tolar felt bullied, and that concerns about her safety and well-being were outweighed by the influence wielded by Jeff Downer.

91.     Additionally, Tolar believed that Jeff Downer, the producer, was retaliating against her, choosing to side with his son.

92.     For example, on December 14, 2015, Jeff Downer yelled at Chinn, Amira, and Shane, and told them that his son better be able to come to the office after Christmas, noting that, "someone needed to go, and it was not going to be Jake Downer."

93.     A manager informed Tolar that she needed to be careful, as Jeff [Downer] did not like her and was looking a reason to fire her.

94.     Although managers expressed concern to/for Tolar, provided assurances of support, and/or displayed ostensible indignation at the reported conduct of Jake Downer, little or no remedial action was taken on Tolar's behalf.

95.     Jake Downer was allowed to stay in his job, in the same location as Tolar, in direct physical proximity to Tolar, and to have continued access to her on a daily/weekly/monthly basis for more than a year after Tolar first brought her complaints, concerns, and objections to the attention of managers and Defendants.

**FIRST CLAIM FOR RELIEF**
**(WORKPLACE HARASSMENT –COERCIVE EMPLOYMENT ENVIRONMENT, VIOLATION OF HRS CHAPTERS 368, 378 and COMMON LAW)**

96.     Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

97.     Defendants condoned, allowed, permitted and/or acquiesced to a situation that was intolerable for Tolar so that the executive director's son would not be demoted or re-located.

98.     Defendants allowed an unacceptable status quo to continue even though the then-existing situation violated the company's own policies, procedures, guidelines, manual, code of conduct, and/or handbook.

99.     Defendants used, distributed and/or instructed their employees to abide by, follow, and comply with a CBS Policy Guide (hereinafter "Guide" or "company handbook"). According to the CBS Policy Guide, it "contains the CBS policies, procedures and programs for CBS Television Stations-employees."

100.   The Guide states that "violation of these policies may result in discipline up to and including termination." It further states that "the policies contained in this Policy Guide apply to all CBS Corporation full-time employees, exempt and non-exempt."

101.   *CBS & You* included a section entitled "Non-Discrimination and Anti-Harassment Policy" that declared "CBS is committed to a work environment in which all individuals are treated with respect and dignity" and that "each individual has the right to work in a professional atmosphere that …prohibits discriminatory practices, including harassment.

102.   CBS further declared that it "expects that all relationships among persons in the workplace will be business-like and free from bias, prejudice and harassment."

103.   The guide further stated:

"Harassing conduct includes, but is not limited to:….threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility toward an individual or group (including through email).

104.   In one section, the Guide *("CBS & You")* described prohibited conduct in the following manner:

"Workplace Violence.

Acts of threats of violence, including intimidation, harassment, and/or coercion, which involve or affect the Company, occur on CBS's property, or in any way stem from employment at CBS will not be tolerated. Examples of workplace violence include, but are not limited to, the following:

All threats or acts of physical violence occurring on Company premises, regardless of the relationship between the Company and the parties involved in the incident.

All threats or acts of violence occurring off the Company premises if they arise from employment at CBS. Statements such as, "Let's take this outside and settle it" are not

acceptable, nor are threats or acts of violence aimed at another employee at home or anywhere away from CBS.

Specific examples of conduct that may be considered threats or acts of violence include, but are not limited to, the following:

Hitting or shoving an individual

Harassing or threatening communications, including but not limited to phone calls, letters or e-mails, text messages or messages delivered through social media sites.

Harassing surveillance or stalking.

Every employee and every person on CBS property is required to report incidents of threats or acts of physical violence of which he/she is aware.

105.    Defendants' behavior, conduct, and actions have created problems for Tolar in the workplace and negatively affected her career.

106.    Defendants' conduct was outrageous, willful and wanton, and malicious.

107.    The actions of Defendants' agents and employees were in violation of HRS §378-2 and common law, in that Tolar was intimidated and suffered injuries and damages.

108.    Eye Productions, Inc., CBS, and its managers, jointly and severally, created a hostile work environment by permitting, condoning and/or failing to prevent the harassment of Tolar by Jake Downer while both Jake Downer and Tolar were employed with Eye Productions, in violation of Chapters 368 and 378 of the Hawaii Revised Statutes and common law.

109.    The conduct of Eye Productions, Inc., CBS, and its managers had the purpose or effect of creating an intimidating, hostile and/or offensive work environment.

110.    As a direct and proximate result of the wrongful conduct of Jake Downer and Jeff Downer, the inaction of various managers, and the lack of enforcement by Eye

Productions, Inc., and CBS, Tolar suffered severe emotional distress, mental anguish, pain and suffering, loss of quality and enjoyment of life, and loss of income, for which Tolar is entitled to special, general and punitive damages against Defendants in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (SEXUAL HARASSMENT and/or INVASION OF PRIVACY)

111.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

112.    In 2014, a manager in a different department from the Locations Department actively pursued Tolar, a subordinate employee, during work hours and/or work functions.

113.    The manager and Tolar entered into a personal and intimate relationship while they were both employed at Eye Productions and/or CBS.

114.    The manager and Tolar had sexual relations while they were both employed by Eye Productions in 2014.

115.    Tolar subsequently informed the manager that she wanted to break off their romantic relationship and discontinue their sexual relations.

116.    Thereafter, Tolar discontinued her romantic relationship with the manager.

117.    Tolar ended their relationship after she had rebuffed his request to become his "girlfriend" on multiple occasions.

118.    Despite the request by Tolar to end their relationship, the manager continued to contact Tolar, by phone and text messages.

119.    Upon information and belief, the manager told other *employees* that he had a sexual relationship with Tolar.

120.   Upon information and belief, the manager told other *managers and supervisors* that he had a sexual relationship with Tolar.

121.   The company policy specifies that employees who engage in personal and sexual relations must disclose that relationship to the Human Relations Department where one employee is a manager or has managerial responsibilities.

122.   However, the manager did not disclose his personal, intimate, or sexual relationship with a subordinate employee (Tolar) to the Human Relations ("HR") department in a written memo or disclosure until *after* a problem had arisen.

123.   Upon information and belief, Tolar believes that the manager showed other employees nude photos of Tolar to co-workers, employees, and/or managers at Eye Productions.

124.   Tolar did not authorize, consent, agree or approve of any Eye Production's employee to circulate, distribute, show, share, email, text, copy, or print nude photos of her in 2015.

125.   Tolar told the manager that she thought it was offensive, weird, rude, and/or inappropriate to take photos of her while she was naked, and/or to show others those photos.  She did not give permission or consent to a manager to share nude photos or her and considered it to be a violation of her privacy.

126.   The manager also texted Tolar nude photos of another girl that he had dated.  Tolar was offended by the violation of privacy and the lack of discretion.

127.   Texting or displaying nude photos constituted prohibited conduct under company guidelines.

128.   *"CBS & You"* stated:

"Misuse of the Internet can result in disciplinary action, up to and including termination.  Some examples of behavior that could result in disciplinary action are:

Sending threatening messages/files."

129.    The manager has/had influence on many of Tolar's co-workers given his position and responsibilities.

130.    It upset Tolar that a manager would use his position and influence to put her in a compromising position or make her feel vulnerable by communicating, sharing, or showing naked photos to another employee.

131.    It is reasonable to expect other employees look[ed] up to manager[s] and aspire[d] to have what he has in influence, responsibilities, and decision-making.

132.    According to company policies adopted by Eye Productions, the transmission, distribution, circulation, and viewing of explicit sexual photos of another employee at Eye Productions, without the permission of the employee, was an express violation of company policy.

133.    Eye Productions put on presentations, at least once each year, to remind and reaffirm all employees, including managers and supervisors, that sexual harassment was unwelcome, unacceptable, and a violation of company policies.

134.    Defendants' manager and/or other Eye Production employees knew or should have known that the romantic relationship with Tolar and/or the sexual conduct, actions, and behavior that he engaged in, while employed by Eye Productions as a manager should have been immediately reported to Human Relations Department.

135.    Additionally, Tolar learned from a supervisor that Jeff Downer and

another director were making lewd, vulgar and inappropriate comments about Tolar while the

managers were working and/or driving in the Scout Van.

136.    *"CBS & You"* stated:

"Sexual harassment constitutes discrimination and is illegal under federal, state and local laws. For the purposes of this policy, sexual harassment is defined, as in the Equal Employment Opportunity Commission Guidelines, as unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when, for example: .... or (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

137.    *"CBS & You"* stated:

"Sexual harassment may include a range of subtle and not so subtle behaviors and may involve individuals of the same or different gender."

138.    *CBS & You"* stated:

"Depending on the circumstance, these behaviors may include, but are not limited to: ...sexual jokes and innuendo; verbal abuse of a sexual nature; commentary about an individual's body; sexual prowess or sexual deficiencies; leering, catcalls or touching; insulting or obscene comments or gestures; display or circulation in the workplace of sexually suggestive objects or pictures (including through email); and other physical, verbal or visual conduct of a sexual nature."

139.    *"CBS & You"* stated:

"Sex-*based* harassment – that.is, harassment not involving sexual activity or language (e.g., male manager yells only at female employees and not males) – may also constitute discrimination if it is severe or pervasive and directed at employees *because of their sex."*

140.    *"CBS & You"* stated:

"INDIVIDUALS AND CONDUCT COVERED.

"These policies apply to all applicants and employees, and prohibit harassment, discrimination and retaliation whether engaged in by fellow employees, by a supervisor or manager." ...

141. *"CBS & You"* stated:

> "Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings and business-related social events."

142. *"CBS & You"* stated:

> "Any employee who engages in such harassment by any means, including in person and/or through the use of e-mail, voicemail, telephone, audio or video devices and/or computer or hard-copy documents, will be subject to discipline, up to and including termination."

143. *"CBS & You"* stated:

> "The availability of this complaint procedure does not preclude individuals who believe they are being subjected to harassing conduct from promptly advising the offender that his or her behavior is unwelcome and requesting that it be discontinued."

144. Further, Jake Downer made unsolicited comments to Tolar on his disapproval of Tolar "hooking up" with the manager who was substantially older than Tolar (She never initiated any conversation with Jake about her private romantic relationships).

145. Jake Downer also pursued unwanted sexual contact with Tolar himself.

146. In a separate instance of sexual harassment or invasion of privacy, Jake Downer told Tolar the graphic details of his sexual encounter with another employee. Tolar was bothered by his lack of discretion and the utter violation of her sense of decency).

147. Tolar repeatedly and publicly advised Jake Downer that his behavior was unwelcome and requested that it be discontinued.

148. As a result of the invasions or privacy, harassment and inappropriate communications, Tolar has experienced high levels of stress, anxiety, and humiliation. She

noticed that she was being treated much differently than before she had been accused of these things.

149.    The publication, sharing, or distribution of private messages or images of Tolar by company employees made Tolar feel highly anxious, nervous, and/or stressed at work. Eventually, Tolar felt that she could not trust anyone at work any longer.

150.    These injuries have caused Tolar pain, loss of function, emotional distress, substantial economic loss, and other damages in an amount to be proven at trial.

151.    Tolar has incurred substantial medical bills since the violations of privacy and related conduct began.

152.    Tolar will also incur future medical, physician and therapy expenses, future loss of income, future emotional distress, pain and suffering, and other damages in an amount to be proven at trial.

153.    Defendants, through their conduct and actions, were responsible for the physical, mental, and emotional injuries inflicted on Tolar.  Said conduct, acts and behavior was a substantial factor and a proximate cause of Tolar's injuries and damages, including, but not limited to, mental and emotional distress, physical suffering, loss of enjoyment of life, economic loss, and all other damages to which Tolar is entitled under Hawaii common law.

### THIRD CLAIM FOR RELIEF
**(BREACH OF EMPLOYMENT CONTRACT AND POLICIES**
**as to DEFENDANTS EYE PRODUCTION and CBS)**

154.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

155.    Defendant Eye Productions, Inc. and/or CBS provided its employees with a copy of an employment handbook, entitled "CBS Policy Guide" and "CBS & You."

156.    The employment guide referenced above is and was at least 57 pages at the time that Tolar began to work for Eye Production, Inc.

157.    According to the employee handbook, the employees are expected to follow certain guidelines established in writing and distributed to the employees as one of the conditions for their employment.

158.    Under the category entitled "Your Workplace (Expectations)", employees are asked to follow guidelines set forth under the heading "Relationships in the Workplace."

159.    According to the section entitled "Relationships in the Workplace," the CBS & You states:

> "in the event a personal relationship develops between two employees, and a supervisory relationship exists between them, the individual with management responsibility shall be required to bring the situation to the attention of his or her manager and Human Resources."

160.    The manager who engaged in a personal relationship with Tolar neglected, failed or refused to follow company policy as described in the company guidelines quoted above.

161.    As a result of the foregoing, Defendants are liable to Tolar for monetary damages arising from its breach of employment contract and policies in amounts to be shown at trial.

## FOURTH CLAIM FOR RELIEF
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

162.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

163.    The Defendants knew of the abuse that Jake Downer visited upon Tolar and refused to take prompt remedial action to protect or safeguard Tolar from the reported abuse.

164.    On numerous occasions, Jake Downer shouted, yelled, and argued with Tolar in the office and while at work.  She felt threatened and at risk because of Downer's violent and unpredictable temperament.

165.    Downer behaved erratically and made bizarre remarks that were unsettling.  He threatened Tolar and verbally abused her.  Downer seemed unstable and sometimes out of control.

166.    Downer made inappropriate, offensive, lewd, and/or explicitly suggestive remarks, behaved in a domineering and presumptuous manner, acted without any control or restraint, and verbally threatened Tolar when they were alone in the workplace.

167.    Downer's actions put Tolar in great fear for her safety, caused high anxiety, and left her vulnerable with respect to an unstable and possibly under-medicated employee who was out of control and **targeting** Tolar.

168.    Tolar told Downer that his behavior was offensive, threatening, and **unwelcome**.

169.    Downer knew or should have known that his threatening and unpredictable behavior stuck fear and terror in Tolar, who was concerned for her safety and well-being.

170.    Downer used his comparatively superior strength and physical presence to cause fear, helplessness, and vulnerability to Tolar in a manner that caused Tolar distress.

171.    Downer's conduct was threatening, intentional, reckless, dangerous, and/or was reasonably foreseeable to cause harm, injury, and fear in Tolar.

172.   Jake Downer used his relationship with his father, Jeff Downer, the executive producer, to represent that the Downers, collectively, or individually, had leverage over Tolar and thereby caused Tolar to feel vulnerable and distressed.

173.   The acts, omissions, and/or wrongful conduct, alleged hereinabove, by Defendants constitute intentional infliction of emotional distress.

174.   Defendants' conduct was outrageous, willful and wanton, and malicious.

175.   As a direct and proximate result of Defendants' wrongful conduct, Tolar has suffered mental anguish, emotional distress, loss of quality and enjoyment of life, pain and suffering, loss of income, and Tolar is therefore entitled to special, general and punitive damages against Defendants in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

176.   Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

177.   Defendants knew or should have known of the reported complaints by Tolar of Jake Downer's abuse, and a manger's intimate relationship with Tolar, and yet neglected, failed and/or refused to take prompt action on Tolar's behalf.

178.   Tolar suffered serious and immediate injuries that required her to seek professional help for treatment and counseling.

179.   Tolar's injuries included, but were not limited to irritation, apathy, headaches, post-traumatic stress, anxiety, depression, sleeplessness, emotional distress, and other health and medical problems arising therefrom.

180.    As a result of the various incidents and events, Tolar sustained serious injuries and has incurred medical expenses, physician charges, and medications in an amount to be proven at trial.

181.    Tolar has suffered and may continue to suffer emotional distress, mental anxiety, feelings of helplessness and hopelessness, irritation and annoyance as a result of her injuries, which were proximately caused by the negligent acts and omissions of Defendants.

182.    Downer's behavior and Tolar's ensuing injuries have caused bad memories, high anxiety, fear, agitation, nervousness, depression and emotional turmoil.

183.    As a result of the foregoing, Tolar is entitled to compensation for the negligent infliction of emotional distress that Defendants caused to Tolar in amounts to be shown at trial.

## SIXTH CLAIM FOR RELIEF
### (ASSAULT AND BATTERY as to DEFENDANT JAKE DOWNER ONLY)

184.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

185.    Downer assaulted and battered Tolar by poking her, pulling her hair, jabbing her, and pouring water on her, spitting, gleeking, and touching her (even after she repeatedly cautioned him not to do so.)

186.    Tolar has incurred medical bills since the assaults, batteries, abuse, harassment, and intimidation of her by Downer began.

187.    Tolar will also incur future medical, physician and therapy expenses, future loss of income, future emotional distress, pain and suffering, and other damages in an amount to be proven at trial.

188.    Jake Downer's unwanted physical contact with Tolar constituted assault and battery of Tolar for which she is entitled to monetary damages and other compensation in an amount to be established at trial.

## SEVENTH CLAIM FOR RELIEF
### (NEGLIGENT RETENTION and/or SUPERVISION as to DEFENDANTS EYE PRODUCTIONS, CBS AND JEFF DOWNER)

189.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

190.    Tolar repeatedly brought her concerns, objections, and requests for protection to the attention of various mid-level and senior managers of Defendants.  remedial action to

191.    On numerous occasions, said managers acknowledged the notice given by Tolar of her safety concerns and her persistent complaints about the inappropriate conduct, aberrant behavior, and/or violations of company policy that Jake Downer brought upon her.

192.    Despite recognizing the verbal and written complaints expressed by Tolar in face-to-face meetings, emails, texts and phone calls, the managers and the companies (Eye Productions and CBS) neglected, failed and/or refused to promptly protect Tolar.

193.    The managers and companies knew or should have known that Tolar's complaints and grievances justified swift attention and action.

194.    Defendants' inaction, delayed responses, and/or inadequate efforts to enforce company policies for the benefit of an employee (Tolar) constituted a violation of company policy and/or the standard of care.

195.    The corporate Defendants allowed the executive director and the father of Jake Downer to wield undue influence such that Defendants neglected their duties as managers

and supervisors to discipline, re-locate, suspend and/or terminate Jake Downer for his outrageous and unacceptable conduct.

196.    Defendants' acquiescence of Jake Downer's conduct over a period that extended for more than a year demonstrated a pattern and practice of neglect to Tolar.

197.    Defendants violated their own guidelines and policies published in "*CBS & You*" described as "Insubordination," "Violation of Company Policy" and "Misconduct."

198.    Defendants neglected, failed and/or refused to immediate discharge the employees who engage in actions described herein.

199.    As a proximate result of the negligent retention and/or supervision of its employees and managers, Defendants Eye Production, CBS and Jeff Downer are liable to Tolar in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### (NEGLIGENCE and/or GROSS NEGLIGENCE)

200.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

201.    Defendants owed a duty to Tolar to protect her from an unreasonable risk and/or dangerous situations brought about by other employees, including Jake Downer.

202.    Defendants breached that duty by failing to take appropriate steps to protect Tolar from the erratic, abnormal and risky behavior of Jake Downer that could easily injure her.

203.    Defendants' actions were a substantial factor and a proximate cause of Tolar's injuries and damages.

204.    Defendants' negligence and/or gross negligence were the legal and factual cause of Tolar's injuries and damages.

205.    As a direct and proximate result of the negligence, and/or gross negligence of Downer, Tolar and is suffering severe and persistent injuries.  These injuries have caused Tolar physical pain and suffering, loss of enjoyment of life, loss of function, physical and emotional distress, disability, substantial economic loss, and other damages in an amount to be proven at trial.

206.    Tolar will also incur future medical, physician and therapy expenses, future loss of income, future emotional distress, pain and suffering and other damages in an amount to be proven at trial.

207.    Defendants Jake Downer, Jeff Downer, Eye Productions, Inc.'s and CBS' actions and/or omissions were so grossly negligent, willful, wanton, and in reckless disregard of the rights and safety of others as to justify the imposition of punitive and/or exemplary damages.

## NINTH CLAIM FOR RELIEF
### (RESPONDEAT SUPERIOR)

208.    Plaintiff hereby incorporates by reference the above paragraphs, as though fully set forth herein.

209.    At all times relevant herein, Jake Downer, Jeff Downer, and others referenced in this Complaint were employee(s) and/or agent(s) of Eye Productions, Inc., CBS, and/or CBUBTL (Hawaii Five-0) dba Entertainment Partners, and/or Doe Partnerships 1-10, Doe Corporations 1-10, Doe "Non-Profit" Corporations 1-10, and Doe Governmental Units 1-10, and were acting within the scope and course of their employment and/or agency when the offensive behavior described herein occurred.

210.    At all times relevant herein, Eye Productions, Inc., CBS, and/or CBUBTL (Hawaii Five-0) dba Entertainment Partners, and/or Doe Partnerships 1-10, Doe Corporations 1-10, Doe "Non-Profit" Corporations 1-10, and Doe Governmental Units 1-10 was/were

responsible for the wrongful acts and consequences of its/their employees, including, but not limited to Jake Downer and Jeff Downer and other supervisors/managers under the doctrine of *respondeat superior*.

211.   As a result of Jake Downer's and Jeff Downer's and other supervisors' and managers' acts, Tolar has suffered and continues to suffer damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Kelly Tolar prays for judgment against Defendants Eye Productions, Inc., CBS Film Distributions, Inc., CBUBTL, CBS Corporation, Inc., Jake Downer and Jeff Downer, jointly and severally, as follows:

1.   General Damages in an amount to be proven at trial;

2.   Special Damages in an amount to be proven at trial;

3.   Exemplary or Punitive Damages in an amount to be proven at trial;

4.   Costs of suit, including reasonable attorney's fees;

5.   Pre-judgment interest; and

6.   For such other and further relief as the Court deems proper.

DATED:  Honolulu, Hawaii, July 21 , 2017.

JASON M. TANI
STUART T. FEELEY
BRYAN M. HARADA
Attorneys for Plaintiff KELLY M. TOLAR

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| KELLY M. TOLAR, | CIVIL NO. 17-1-1206-07 KKH |
| Plaintiff, | (Harassment in Workplace) |
| vs. | DEMAND FOR JURY TRIAL |
| EYE PRODUCTIONS, INC; CBS FILM DISTRIBUTIONS, INC.; CBUBTL (Hawaii 5-0) dba ENTERTAINMENT PARTNERS; CBS CORPORATION, INC.; JEFFREY M. DOWNER; JAKE DOWNER; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE "NON PROFIT" CORPORATIONS 1-10; and DOE GOVERNMENTAL UNITS 1-10, | |
| Defendants. | |

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Hawaii Rules of Civil Procedure, Plaintiff KELLY M. TOLAR, by and through her counsel undersigned, hereby demands a trial by jury on all issues triable in the Complaint.

DATED: Honolulu, Hawaii, July 21, 2017.

JASON M. TANI
STUART T. FEELEY
BRYAN M. HARADA
Attorneys for Plaintiff KELLY M. TOLAR

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | |
|---|---|
| KELLY M. TOLAR, | CIVIL NO. **17-1-1206-07** KKH |
| Plaintiff, | (Harassment in Workplace) |
| vs. | SUMMONS TO ANSWER CIVIL COMPLAINT |
| EYE PRODUCTIONS, INC.; CBS FILM DISTRIBUTIONS, INC; CBUBTL (Hawaii 5-0) dba ENTERTAINMENT PARTNERS; CBS CORPORATION, INC.; JEFFREY M. DOWNER; JAKE DOWNER; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE "NON PROFIT" CORPORATIONS 1-10; and DOE GOVERNMENTAL UNITS 1-10, | |
| Defendants. | |

## SUMMONS TO ANSWER CIVIL COMPLAINT

TO THE DEFENDANTS:

You are hereby summoned and required to file with the Court and serve upon Plaintiff's attorneys, whose address is 737 Bishop Street, Suite 2400, Honolulu, HI 96813, an answer to the Complaint which is herewith served upon you, within twenty (20) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint. This Summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a Judge of the above-entitled Court permits, in writing on this Summons, personal delivery during those hours.

A failure to obey this Summons may result in an entry of default and default judgment against the disobeying person or party.

DATED:        Honolulu, Hawaii _____.

**JUL 2 1 2017**

N. ANAYA

CLERK OF THE ABOVE ENTITLED COURT